# Exhibit 2

ORIGINAL

LORETTA E. LYNCH
United States Attorney General

LAURA E. DUFFY
United States Attorney

MICHAEL G. WHEAT, CBN 118598
JANAKI S. GANDHI, CBN 272246
COLIN M. MCDONALD, CBN 286561
Special Attorneys to the Attorney General
880 Front Street, Room 6293
San Diego, CA 92101
Tel: 619-546-8437/8817/9144
Email: michael.wheat@usdoj.gov

Attorneys for the United States

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 09 2016

at____o'clock and____min.____M.
SUE BEITIA, CLERK

SEALED

BY ORDER OF THE COURT

# UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> NIALL SILVA, <br><br> Defendant. | Case No. CR 16-00787SOM <br><br> INFORMATION <br><br> Title 18, U.S.C., Section 371-Conspiracy (Felony) |

The United States Attorney charges, at all times material:

### COUNT 1

### CONSPIRACY – 18 U.S.C. § 371

1.  Defendant NIALL SILVA (SILVA) was a police officer employed with the Honolulu Police Department (HPD), assigned to the HPD's Criminal

Intelligence Unit (CIU) as a technician. The CIU was a specialized unit of the HPD, chosen by the executive staff of the HPD to gather intelligence in organized crime and terrorism cases. SILVA was supervised in CIU by a lieutenant and a captain, who ultimately reported to the HPD's Chief of Police.

2.      The United States Postal Inspection Service (USPIS) was a law enforcement agency of the United States and arm of the executive branch designated to support and protect the United States Postal Service and its employees, infrastructure, and customers; to enforce the laws that defend the nation's mail system; and to ensure public trust in the mail. As part of its lawful and legitimate functions, USPIS investigated crimes against the property of the Postal Service and, where sufficient evidence existed, referred such offenses for criminal prosecution.

3.      The United States Attorney's Office for the District of Hawaii (USAO-Hawaii) was an agency of the United States and arm of the executive branch that, among other matters, prosecuted violations of federal criminal law in the United States District Court for the District of Hawaii (USDC-Hawaii).

4.      Beginning on a date unknown, but no later than June 21, 2013, and continuing up to and including June 2, 2016, within the District of Hawaii, defendant NIALL SILVA and other co-conspirators did knowingly and willfully combine, conspire, and agree together, with each other and with others to commit the following offenses against the United States:

2

    a.     To knowingly alter and falsify records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation of a matter within the jurisdiction of a department and agency of the United States, in violation of Title 18, United States Code, Section 1519;

    b.     To corruptly obstruct, influence, and impede an official proceeding—that is, a federal criminal prosecution brought in the USDC-Hawaii—in violation of Title 18, United States Code, Section 1512(c); and

    c.     To knowingly and willfully make a materially false, fictitious, and fraudulent statement in a matter within the jurisdiction of the executive branch of the Government of the United States—that is, the investigation and prosecution of an individual for a mailbox theft—in violation of Title 18, United States Code, Section 1001.

It was a purpose of the conspiracy to alter evidence and documents, provide false information to the USPIS and the USAO-Hawaii, and present false testimony and evidence in a criminal trial in the USDC-Hawaii, in connection with a criminal investigation and prosecution of G.K.P. for allegedly stealing a United States Postal Service mailbox.

//

## MANNER AND MEANS OF THE CONSPIRACY

5.     It was part of the conspiracy that in order to frame and discredit

G.K.P., Co-conspirator No.1 (CC1) would falsely claim that a United States Postal

Service mailbox in front of CC1's residence in Honolulu, Hawaii had been stolen.

6.     It was further part of the conspiracy that in order to conceal and alter

evidence of the alleged theft, Co-conspirator No.2 (CC2), a HPD police officer,

would retrieve the hard drive from a security system at CC1's residence, prior to

CC1 actually reporting the theft to HPD.

7.     It was further part of the conspiracy that CC2 would deliver the hard

drive to SILVA at HPD headquarters, review the recording on the hard drive, and

falsely identify a person depicted on the recording taking the mailbox as G.K.P.

8.     It was further part of the conspiracy that SILVA and CC2 would falsely

claim that they had met at CC1's residence on the day the alleged theft was reported,

checked the security system, verified its accuracy, retrieved the system's hard drive,

and transported the hard drive to HPD headquarters.

9.     It was further part of the conspiracy that Co-conspirator No.3 (CC3), a

HPD police officer, instructed SILVA to maintain the hard drive contrary to HPD

policies regarding evidence retention in order to conceal evidence of the alleged

theft.

10.     It was further part of the conspiracy that even though the hard drive was

seized by CC2 prior to the report of the theft, Co-conspirator No.4 (CC4), a HPD

police officer, would falsely claim that on the day the alleged theft was reported, CC4 assigned CIU officers to go to CC1's residence to retrieve the hard drive.

11.   It was further part of the conspiracy that the conspirators would write false and misleading HPD reports about the circumstances of the alleged theft, the seizure of the hard drive, and the identification of G.K.P. as the perpetrator and provide those reports to USPIS and USAO-Hawaii to support a prosecution of G.K.P. for theft of a United States Postal Service mailbox.

12.   It was further part of the conspiracy that the conspirators would make false and misleading statements to federal agents, including USPIS Inspectors, and provide false and misleading testimony during the federal criminal trial of G.K.P. in USDC-Hawaii.

## OVERT ACTS

In furtherance of said conspiracy, and to affect the objects thereof, the following overt acts, among others, were committed within the District of Hawaii:

a.   On or about Friday, June 21, 2013, CC2 changed the hard drive in the security system at CC1's residence.

b.   On Saturday, June 22, 2013, before 1:28 p.m., CC2 removed the hard drive from the security system at CC1's residence.

c.   On or about June 22, 2013, at about 1:28 p.m., CC2 telephoned CC1.

     d.     On or about June 22, 2013, at about 1:31 p.m., CC1 telephoned the HPD to report the alleged theft of a Postal Service mailbox from CC1's residence the night before.

     e.     On or about June 22, 2013, after 1:31 p.m., CC2 delivered the hard drive to SILVA at HPD headquarters.

     f.     On or about June 22, 2013, after 2:30 p.m., CC2 and SILVA reviewed the hard drive recovered by CC2.

     g.     On or about June 22, 2013, after 2:30 p.m., CC2 falsely identified G.K.P. as a person depicted on the hard drive "stealing" the mailbox.

     h.     On or about June 22, 2013, after 2:30 p.m., SILVA excised portions of data recovered from the hard drive and transferred those excised portions to disks.

     i.     On or about June 22, 2013, after 2:30 p.m., at HPD headquarters, SILVA gave copies of the disks to CC3 and Co-conspirator No.5 (CC5), a HPD police officer.

     j.     On or about June 22, 2013, after 2:30 p.m., SILVA placed the hard drive from CC1's residence into SILVA's desk.

     k.     On or about June 22, 2013, after 2:30 p.m., CC3 instructed SILVA not to place the hard drive into HPD evidence.

     l.     On or about July 1, 2013, CC3 instructed SILVA to place into HPD evidence only the excised portions of data recovered from the hard drive.

m      On or about July 1, 2013, at about 11:15 a.m., SILVA placed into HPD evidence the excised portions of the data recovered from the hard drive.

n.      On or about July 5, 2013, CC2 falsely told a USPIS Inspector that he was present when SILVA recovered the hard drive from CC1's residence.

o.      On or about June 18, 2014, at about 10:49 a.m., SILVA falsely told a USPIS Inspector that he personally recovered the hard drive from CC1's residence.

p.      On or about June 18, 2014, at about 1:17 p.m., after SILVA spoke to USPIS Inspectors, SILVA called CC2.

q.      On or about June 19, 2014, at about 12:00 p.m., SILVA again provided a USPIS Inspector with false information about the "investigation" into the alleged mailbox theft.

r.      On or about December 1, 2014, CC2 and SILVA discussed the false testimony the conspirators expected to provide at the upcoming federal criminal trial of G.K.P. for theft of the mailbox.

s.      On or about December 4, 2014, SILVA falsely testified in the trial of G.K.P. that on June 22, 2013, at 8:59 a.m., he personally went to CC1's residence, verified the security system was in good working order on the date and time of the incident (June 21, 2013, 10:31 p.m.), that recordings were made, and that he retrieved the recordings from the residence.

t.      On or about December 4, 2014, CC2 texted SILVA about the false evidence provided in the federal criminal trial of G.K.P.

u.      On or about November 19, 2015, at about 3:42 p.m., after being contacted by the Federal Bureau of Investigation (FBI) about G.K.P.'s trial, CC2 called SILVA.

v.      On or about November 24, 2015, CC2 provided false and misleading information to the FBI about the alleged mailbox theft from CC1's residence.

w.      On or about January 7, 2016, CC4 falsely testified that on the morning of June 22, 2013, he directed SILVA to go to CC1's residence and recover the hard drive from the security system.

All in violation of Title 18, United States Code, Section 371.

DATED:      December _7_, 2016.

> LORETTA E. LYNCH
> United States Attorney General
>
> LAURA E. DUFFY
> United Sates Attorney
>
> MICHAEL G. WHEAT
> Special Attorney of the United States