SEALED
BY ORDER OF THE COURT

**<u>WARNING</u>: THIS DOCUMENT FILED UNDER SEAL
PURSUANT TO JANUARY 19, 2017 ORDER**

FLORENCE T. NAKAKUNI  #2286
United States Attorney
District of Hawaii

RACHEL S. MORIYAMA  #3802
THOMAS MUEHLECK  #3591
Assistant U.S. Attorneys
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
E-mail:  Rachel.Moriyama@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 07 2017

at 11 o'clock and 55 min. AM
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

CV17  00107 DKW KJM

| | |
|---|---|
| IN RE APPLICABILITY OF ATTORNEY-CLIENT PRIVILEGE AND CRIME-FRAUD EXCEPTION TO CERTAIN AUDIO RECORDINGS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MAG NO.  17-0075 KJM<br><br>GOVERNMENT'S APPEAL AND REQUEST TO DISTRICT COURT TO RECONSIDER A PRETRIAL MATTER DETERMINED BY THE MAGISTRATE JUDGE; MEMORANDUM IN SUPPORT OF GOVERNMENT'S APPEAL AND REQUEST TO DISTRICT COURT TO RECONSIDER A PRETRIAL MATTER DETERMINED BY THE MAGISTRATE JUDGE |

## GOVERNMENT'S APPEAL AND REQUEST TO
## DISTRICT COURT TO RECONSIDER A
## <u>PRETRIAL MATTER DETERMINED BY THE MAGISTRATE JUDGE</u>

The United States hereby respectfully appeals and requests this Court to reconsider Magistrate Judge Kenneth J. Mansfield's February 22, 2017 Order Denying Government's Motion for Reconsideration of Oral Ruling Denying *Ex Parte* Motion for Determination of Applicability of Attorney-Client Privilege and Crime-Fraud Exception to Certain Audio Recordings (Doc. No. 9) (the "Order"), pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a) and CrimLR57.3(b), on the grounds that the Order is contrary to law and/or clearly erroneous.

This appeal and request for reconsideration is brought pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a) and CrimLR57.3(b), and is based upon the attached memorandum and the pleadings, declarations and exhibits filed herein.

Dated:  March 7, 2017, at Honolulu, Hawaii.

FLORENCE T. NAKAKUNI
United States Attorney
District of Hawaii

By _____
    RACHEL S. MORIYAMA
    THOMAS MUEHLECK
    Assistant U.S. Attorneys

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

IN RE APPLICABILITY OF           )     MAG NO.  17-0075 KJM
ATTORNEY-CLIENT PRIVILEGE        )
AND CRIME-FRAUD EXCEPTION        )     MEMORANDUM IN SUPPORT OF
TO CERTAIN AUDIO                 )     GOVERNMENT'S APPEAL AND
RECORDINGS                       )     REQUEST TO DISTRICT COURT
                                 )     TO RECONSIDER A PRETRIAL
                                 )     MATTER DETERMINED BY THE
                                 )     MAGISTRATE JUDGE
                                 )
                                 )
_____)

## TABLE OF CONTENTS

I.   STATEMENT OF FACTS ................................................................... 1

   A.  Overview/Procedural History ..................................................... 1

II.  ARGUMENT ...................................................................................... 5

   A.   The Magistrate Judge's Ruling That
        The Court Lacked Supervisory Jurisdiction
        Over This Pending Grand Jury Investigation
        Was Clearly Erroneous and Contrary to Law ...................................... 5

   B.   The Magistrate Judge Applied Incorrect
        Legal Standards In Making The Crime-Fraud
        Exception Determination................................................................ 10

   C.   On Reconsideration, The Court Should Find
        That The Crime-Fraud Exception Applies
        In This Case ................................................................................ 15

        1.  The Proffered Evidence Was Sufficient
            to Establish a *Prima Facie* Showing of
            a Violation of 18 U.S.C. § 666 ................................................... 15

        2.  The Subject Recorded Conversations Are
            Related to, and in Furtherance of, the
            Alleged Violation of 18 U.S.C. § 666 .......................................... 22

III. CONCLUSION ................................................................................. 23

# TABLE OF AUTHORITIES

CASES                                                                                              PAGES

*Blair v. United States*,
   250 U.S. 273 (1919) ........................................................................................... 7

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) ........................................................................................... 6

*Brown v. United States*,
   359 U.S. 41 (1959) ............................................................................................. 7

*Carlson v. United States*,
   837 F.3d 753 (7th Cir. 2016) .............................................................................. 7

*Harris v. DeSoto*,
   80 Haw. 425 (1996) ........................................................................................... 18

*In re Grand Jury Proceedings*,
   867 F.2d 539 (9th Cir. 1989) .............................................................................. 10

*In re Grand Jury Proceedings #5*,
   402 F.3d 247 (4th Cir. 2005) .............................................................................. 8

*In re Grand Jury Proceedings (The Corporation)*,
   87 F.3d 377 (9th Cir. 1996) ................................................................................ 15

*In re Grand Jury Subpoena*,
   223 F.3d 213 (3d Cir. 2000) ........................................................................... 7-8, 9

*In re Grand Jury Subpoenas*,
   144 F.3d 653 (10th Cir. 1998) ........................................................................... 9

*Levine v. United States*,
   362 U.S. 610 (1960) ........................................................................................... 6

*United States v. Brann*,
   990 F.2d 98 (3d Cir. 1993) ................................................................................. 16

CASES                                                                                      PAGES

*United States v. Calandra,*
    414 U.S. 338 (1974) ........................................................................ 8

*United States v. Chen,*
    99 F.3d 1495 (9th Cir. 1996) ...................................................... 15, 16

*United States v. Dionisio,*
    410 U.S. 1 (1973) ........................................................................... 8

*United States v. Fernandez,*
    2013 WL 3215461 (1st Cir. June 26, 2013) ...................................... 16

*United States v. Frazier,*
    53 F.3d 1105 (10th Cir. 1995) ........................................................ 17

*United States v. Shelton,*
    816 F. Supp. 1132 (W.D. Tex. 1993) .............................................. 17

*United States v. Urlacher,*
    979 F.2d 935 (2nd Cir. 1992) .............................................. 16, 17, 19

*United States v. Williams,*
    504 U.S. 36 (1992) ...................................................................... 6, 7

*United States v. Zolin,*
    491 U.S. 554 (1989) .......................................................... 12, 15, 17

FEDERAL STATUTES/RULES                                             PAGES

    18 U.S.C. § 666 ................................................................... passim

    18 U.S.C. § 666(a)(1)(A) ..................................................... passim

    28 U.S.C. § 636(b)(1)(A) ............................................................ 1

    Fed. R. Crim. P. 59(a) ................................................................. 1

    CrimLR57.3 ................................................................................ 1

| CITY ORDINANCES | PAGES |
|---|---|
| ROH § 2-3.1(d)(1) | 18 |
| ROH § 2-3.4(a) | 18, 19, 20, 22 |
| ROH § 2-17.2(c)(1) | 18, 19, 21, 22 |

MEMORANDUM IN SUPPORT OF GOVERNMENT'S APPEAL
AND REQUEST TO DISTRICT COURT TO RECONSIDER
<u>A PRETRIAL MATTER DETERMINED BY THE MAGISTRATE JUDGE</u>

At issue in this appeal is whether the crime-fraud exception to the attorney-client privilege should be applied to vitiate any attorney-client protections relating to audio recordings of conversations between Honolulu Police Department ("HPD") senior staff and certain City and County of Honolulu (the "City") attorneys and high-ranking officials which were surreptitiously recorded by the HPD and voluntarily turned over to the Federal Bureau of Investigation ("FBI") as evidence of possible federal crimes.

The United States hereby respectfully appeals and requests this Court to reconsider Magistrate Judge Kenneth J. Mansfield's February 22, 2017 Order Denying Government's Motion for Reconsideration of Oral Ruling Denying *Ex Parte* Motion for Determination of Applicability of Attorney-Client Privilege and Crime-Fraud Exception to Certain Audio Recordings (Doc. No. 9) (the "Order"), pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a) and CrimLR57.3(b), on the grounds that the Order is contrary to law and/or clearly erroneous.

I.     <u>STATEMENT OF FACTS</u>

A.     <u>Overview/Procedural History</u>.

This appeal is filed by government "taint team" attorneys in connection with the investigation of possible new crimes that arose from, and are related to, the

pending grand jury investigation of former HPD Chief Louis Kealoha, his wife

Katherine Kealoha, and others. *See* Grand Jury Proceeding No. 15-1-7 (the

"Kealoha Investigation"). This new matter was referred to the FBI by HPD senior

staff and involves allegations that certain City attorneys and officials were

conspiring to intentionally misapply HPD and City funds in order to pay a

$250,000 lump-sum settlement to Kealoha[1] without first obtaining Honolulu City

Council approval, as required by City ordinances, in violation of 18 U.S.C. § 666.

The City attorneys and officials who are the subject of this investigation include

Corporation Counsel Donna Leong; Honolulu Police Commission Chair Max

Sword; Nelson Koyanagi, the Director of the City's Department of Budget and

Fiscal Services ("BFS"); and Deputy Corporation Counsel DP          .

In support of its allegations, the HPD provided information to the FBI,

including several audio recordings of conversations between Acting HPD Chief

Cary Okimoto and Leong, Sword, Koyanagi and/or DP   which are the subject of

this appeal. Because Leong and DP   are City attorneys who provide legal

representation and advice to the City and its agencies, the taint team attorneys

carefully reviewed the recordings in order to avoid tainting the investigation by

releasing any potentially privileged communications to the investigative team for

---

[1] The payment of the lump-sum settlement was negotiated by Kealoha and the
Honolulu Police Commission after Kealoha announced his intention to retire after
receiving a federal "target letter" in connection with the Kealoha Investigation.

2

its review and presentation to the Grand Jury.  Despite strong policy arguments that the recorded conversations between government attorneys and officials should not be protected by the attorney-client privilege in the context of a criminal investigation of possible official government misconduct,[2] the taint team recognized that, in light of the *ex parte* and non-adversarial nature of grand jury investigations, the United States and the individual taint team attorneys had an ethical duty to protect the integrity of the grand jury process.

On January 19, 2017, the Government filed a sealed, *ex parte* motion seeking a judicial finding that the crime-fraud exception applied to abrogate any possible privilege protecting the recorded conversations (Doc. No. 2) (the "Motion").  On January 19, 2017, Magistrate Judge Kenneth J. Mansfield orally denied the motion based on findings that the Court lacked jurisdiction to provide advisory opinions to the Government and that the Government had failed to make the requisite *prima facie* showing of the alleged federal crime, *i.e.*, 18 U.S.C. § 666.  *See* Transcript of Sealed Proceedings dated January 19, 2017, attached as Ex. "E" to Second Moriyama Decl. (Doc. No. 7-7), at 48:8 to 49:19.

On February 3, 2017, the Government filed a motion for reconsideration (Doc. No. 7) (the "Recon. Motion") in order to provide the Court with corrected

---

[2] *See* memorandum in support of motion for reconsideration (Doc. No. 7-1) (the "Recon. Memo") at 18-20.

transcripts of the four audio recordings, *see* Exs. "A"-"D" (Doc. Nos. 7-3 to 7-6) and additional evidence that had not been available to the Government at the time it filed its initial motion. *See* Second Moriyama Decl. (Doc. No. 7-2) and Exs. "F"-"I" (Doc. Nos. 7-8 to 7-11). The Government provided a detailed description of the investigation and the evidence, *see* Recon. Memo at 1-17, and presented its *prima-facie* showing required to apply the crime-fraud exception -- *i.e.*, there was "reasonable cause to believe" that (1) Leong, Sword, Koyanagi, Leong and/or others had or were attempting to intentionally misapply $250,000 in HPD and City funds to pay the $250,000 settlement to Kealoha without obtaining City Council approval, as required by Hawaii law, in violation of 18 U.S.C. § 666(a)(1)(A), *id*. at 20-28; and (2) the subject recorded conversations were related to the alleged crime. *Id*. at 5-9, 28. On February 9, 2017, the Government filed a supplemental memorandum to present additional new evidence to show that the settlement check for Kealoha had been issued by BFS and delivered to Kealoha's attorney, and that the BFS has processed the transfer of funds used to pay Kealoha in a highly unusual manner that was wholly consistent with the alleged scheme discussed by Leong, Sword, Koyanagi and DP in various meetings and conversations, including the subject recorded conversations. *See* supplemental memorandum in support of Recon. Motion (Doc. No. 8) (the "Supp. Memo"), the Third Moriyama Decl. (Doc. No. 8-1) and Exs. "J"-"L" (Doc. Nos. 8-2 to 8-4).

On February 22, 2017, Magistrate Judge Mansfield issued an Order Denying

Government's Motion for Reconsideration Motion of Oral Ruling Denying *Ex*

*Parte* Motion for Determination of Applicability of Attorney-Client Privilege and

Crime-Fraud Exception to Certain Audio Recordings (Doc. No. 9) (the "Order").

The magistrate judge denied the Recon. Motion based primarily upon erroneous

conclusions that the Court lacked jurisdiction, *see* Order at 12-16; the Government

was not justified in filing its crime-fraud exception motion on an *ex parte* basis, *id*.

at 16-18; and the Government had improperly proffered hearsay evidence in

support of the Recon. Motion. *Id*. at 8-11. The Order also referenced incorrect

legal standards for i*n camera* review of the purported privileged materials and for

applying the crime-fraud exception itself. *Id*. at 20-23. As a result, the magistrate

judge denied the Recon. Motion without ever properly considering the merits or

adequacy of the evidence presented by the United States to support the invocation

of the crime-fraud exception in this case.

## II. ARGUMENT

A. The Magistrate Judge's Ruling That The Court Lacked
Supervisory Jurisdiction Over This Pending Grand Jury
Investigation Was Clearly Erroneous And Contrary to Law.

Citing Section 2 of Article III of the United States Constitution, the

magistrate judge denied the Recon. Motion based on a perceived lack of

jurisdiction to determine whether the crime-fraud exception applied to the recorded

conversations:

> It is axiomatic that a court has no authority to act unless it has jurisdiction.  Section 2 of Article III of the Constitution allows federal courts to consider only "cases" and "controversies."  The Supreme Court has held "[t]hose two words confine 'the business of federal courts to questions presented in an *adversary context* and in a form historically viewed as capable of resolution through the judicial process.'"

*Order* at 12- 13 (citations omitted) (emphasis added).  He also found that the Government was not justified in filing this motion on an *ex parte* basis, *id.* at 16-18; the Government had failed to comply with the notice requirements of LR6.2(c), *id.* at 16-17; the Government had "not named any potential defendants in this matter, has not filed a proceeding, and has not provided any notice of its Motion to persons whose interests may be impacted by the Court's ruling," *id.* at 17; and the Government's declarations were insufficient because they contained "second or third-hand hearsay." *Id.* at 11.  These rulings are contrary to law and clearly erroneous.

The inherent supervisory power of the court over the grand jury is well established.  Although the grand jury operates according to a "tradition of independence," *United States v. Williams*, 504 U.S. 36, 49 (1992), it is part of the judicial process and is subject to the supervision of the courts. *See Branzburg v. Hayes*, 408 U.S. 665, 688 (1972) ("the powers of the grand jury are . . . subject to the supervision of a judge"); *Levine v. United States*, 362 U.S. 610, 617 (1960) (the

6

grand jury is "an arm of the court"); *Brown v. United States*, 359 U.S. 41, 49 (1959) ("[a] grand jury is clothed with great independence in many areas, but it remains an appendage of the court"); *Blair v. United States*, 250 U.S. 273, 280 (1919) ("the inquisitorial function of the grand jury ... [is] incident[ to] the judicial power of the United States"); *Carlson v. United States*, 837 F.3d 753, 761 (7th Cir. 2016) ("The grand jury is an 'arm of the court' and thus falls under the supervisory authority of the district court."). Given the grand jury's role as an independent body, the district court's supervisory power is limited and may be used only to "preserve or enhance the traditional functioning of the grand jury." *See Carlson*, 837 F.3d at 762 (*quoting Williams*, 504 at 50). In exercising its supervisory authority over grand jury investigations, courts frequently employ *in camera* proceedings and review *ex parte* affidavits in order to protect grand jury secrecy in various contexts, including applications for search and seizure warrants and Title III wiretaps, and questions relating to privileges and the invocation of the crime-fraud exception.

Federal grand jury proceedings are not adversarial proceedings, and many matters relating to on-going grand jury investigations are routinely handled in *ex parte* proceedings that are not bound by the rules of evidence:

> A grand jury proceeding *is not an adversary hearing where guilt or innocence is adjudicated* but an *ex parte* investigation to determine if there is probable cause to believe a crime has been committed. The grand jury deliberates in secret and acts "independently of either

prosecuting attorney or judge."  Because it is essential to the federal
criminal justice system, this investigative body has great powers of
investigation and inquisition.  The grand jury may generally "compel
the production of evidence or testimony of witnesses . . . *unrestrained
by the technical procedural and evidentiary rules governing the
conduct of criminal trials*."

*In re Grand Jury Subpoena*, 223 F.3d 213, 216 (3d Cir. 2000) (*citing United States*

*v. Dionisio*, 410 U.S. 1, 16 (1973) and *United States v. Calandra*, 414 U.S. 338,

343 (1974)) (emphasis added); *see also In re Grand Jury Proceedings #5*, 402 F.3d

247, 255 (4th Cir. 2005) (noting that in making the crime-fraud exception

determination, a court may consider testimony "or a reliable government proffer").

The Supreme Court has held that saddling a grand jury with mini-trials "would

assuredly impede its investigation and frustrate the public's interest in the fair and

expeditious administration of the criminal laws."  *Dionisio*, 410 U.S. at 17.

The magistrate judge's ruling that the Court lacked jurisdiction was based on

an erroneously finding there was no pending grand jury proceeding,[3] despite

---

[3] *See* Transcript of Sealed Proceeding (Ex. "E"/Doc. No. 7-7) at 44:24-25 ("there
is no active grand jury for this potential crime") and 48:13-15 ("There's not an
active grand jury investigating the crime you believe is occurring or is about to
occur."); *see also* Order at 13-14 ("The Government has not established any nexus
between the information contained in the audio recordings and the pending grand
jury proceeding relating to the alleged theft of a mailbox.") and 15-16 ("the
Government has not provided any authority for the proposition that it is proper for
the Court to make this kind of determination before a case has been filed or grand
jury empaneled.  The Government's reference to a potential grand jury
investigation into the matter here does not change the Court's analysis.").

repeated proffers and representations by government counsel that the investigation

into this new matter (*i.e.*, the alleged intentional misapplication of HPD and City

funds to pay the $250,000 Kealoha settlement without required City Council

approval) arose out of, and was an expansion of, the on-going Kealoha

Investigation (Grand Jury Proceeding No. 15-1-7).  S*ee, e.g.*, Transcript of Sealed

Proceeding (Ex. "E"/Doc. No. 7-7) at 5:9 to 6:1; 7:1-24; 8:14-24; 38:25 to 40:4;

Recon. Memo at 17 (stating that subject to the Court's ruling on the crime-fraud

exception, the United States intended to present the evidence, including the subject

recorded conversations, to the Grand Jury as evidence of possible official

government misconduct in violation of 18 U.S.C. § 666, and to call certain City

officials to provide testimony to Grand Jury).

        In addition, the magistrate judge held that "if the Court were to take on a

"supervisory role" based on the pending grand jury proceeding, the targets of the

grand jury proceeding would be entitled to notice of the Government's Motion

with regard to the audio recordings."  Order at 14 (citing the Fifth and Fourteenth

Amendments to the Constitution).  This ruling is contrary to law.  *See, e.g., In re*

*Grand Jury Subpoena*, 223 F.3d at 219 (grand jury targets' inability to inspect and

rebut government's *ex parte* affidavit supporting invocation of crime-fraud

exception does not violate due process); *In re Grand Jury Subpoenas*, 144 F.3d

653 (10th Cir. 1998) (no abuse of discretion or due process violation based on

9

court's refusal to disclose *ex parte* government affidavit upon which it relied to

determine that crime-fraud exception applied to target); *In re Grand Jury*

*Proceedings*, 867 F.2d 539, 540-41 (9th Cir. 1989) (rejecting argument that due

process violated when district court relied on an *ex parte* affidavit to decide that

government satisfied threshold showing to conduct an *in camera* hearing to

determine whether the crime-fraud exception applied).

B.    The Magistrate Judge Applied Incorrect Legal Standards
       In Making The Crime-Fraud Exception Determination.

A review of the Order reveals that incorrect legal standards were applied in

determining whether the Government had made the *prima facie* showing necessary

to invoke the crime-fraud exception and abrogate any privilege relating to the three

recorded conversations.  First and foremost, the magistrate judge erroneously

referred to a "probable cause" standard, rather than the less stringent "*prima facie*

showing" standard, to determine whether the Government had met the evidentiary

standard to apply the crime-fraud exception:

> The court must then determine whether there is *probable cause* to
> believe that a crime or fraud has been committed and that the
> communication was in furtherance thereof.

*See* Order at 21 (citation omitted) (emphasis added).

Second, the magistrate judge improperly refused to consider the contents of

the three recorded conversations in making the crime-fraud determination based on

an erroneous finding that the Government had not requested the Court to consider

10

the purportedly privileged materials *in camera*. *Id*. at 22. In making that finding,

the magistrate judge relied upon a statement made by the Government in its initial

Motion,[4] and rejected repeated requests on reconsideration to consider the contents

of the recorded conversations as evidence supporting the application of the crime-

fraud determination. *See, e.g.*, Recon. Memo at 21-22 ("*the recorded*

*conversations*, along with the newly discovered evidence, are sufficient to establish

a *prima facie* showing") (emphasis added) and 28 ("Based on *the four recorded*

*conversations* and the newly discovered evidence presented in support of this

motion for reconsideration, the Court should find that the United States has

presented sufficient evidence to establish reasonable cause to believe that Leong,

Sword, Koyanagi and ██ are involved in a violation of 18 U.S.C. § 666 and/or a

conspiracy or attempt to violate 18 U.S.C. § 666") (emphasis added).

---

[4] In its memorandum of support of the Motion, the Government stated:

> In this case, the Government believes that the non-privileged evidence
> available to the Court more than adequately establishes a *prima facie*
> case for the application of the crime-fraud exception to the category of
> communications here. *Unless the Court believes it is necessary* and
> appropriate to consider the putatively privileged communications *in*
> *camera under Zolin's* two-part test, the government is not requesting
> the Court to do so.

*See* Doc. No. 2-1 at 11-12 (emphasis added). By this language, the Government
reserved, and did not waive, its right to request *in camera* review and consideration
of the allegedly privileged material if the Court determined that the independent
evidence was not sufficient.

In enunciating the applicable standard for *in camera* review of the privileged

materials in *Zolin*, the Supreme Court observed that "*in camera* inspection . . . is a

smaller intrusion upon the confidentiality of the attorney-client relationship than is

public disclosure," and "a lesser evidentiary showing is needed to trigger *in

camera* review than is required ultimately to overcome the privilege:

> We think that the following standard strikes the correct balance.
> Before engaging in in camera review to determine the applicability of
> the crime-fraud exception, *"the judge should require a showing of a
> factual basis adequate to support a good faith belief by a reasonable
> person"* that in camera review of the [privileged] materials may
> reveal evidence to establish the claim that the crime-fraud exception
> applies.
>
> Once that showing is made, the decision whether to engage in
> *in camera* review rests in the sound discretion of the district court.
> The court should make that decision in light of the facts and
> circumstances of the particular case, including, among other things,
> the volume of materials the district court has been asked to review, *the
> relative importance to the case of the alleged privileged information*,
> and *the likelihood that the evidence produced through in camera
> review, together with other available evidence then before the court,
> will establish that the crime-fraud exception does apply*.

*United States v. Zolin*, 491 U.S. 554, 572 (1989) (citations omitted) (emphasis

added). Instead of considering the independent evidence proffered by the

Government to determine whether the threshold showing for *in camera* review had

been satisfied, the magistrate judge applied the following incorrect legal standard:

> The Government did not provide the Court *with non-privileged
> evidence that would establish "a good-faith belief" for inferring that
> a crime had been committed and/or that a communication between an
> attorney and client was in furtherance or anticipation of a criminal*

*act*.  Instead, the Government provided the Court with un-redacted transcripts of all of the communications and asked the Court to make a blanket determination that the crime-fraud exception applied to all of the potentially privileged communications.  The Government seeks to leapfrog the requirements of *Zolin* and give the Court unfettered access to potentially privileged information in an attempt to find a crime-fraud exception to the privilege.

Order at 21-22 (citations omitted) (emphasis added).  A review of the record

reveals that the United States did satisfy the threshold showing for *in camera*

review – that is, the Government did present independent evidence sufficient to

support "a good faith belief by a reasonable person" that *in camera* review of the

three recorded conversations could reveal evidence to establish the Government's

claim that the crime-fraud exception applies.  *See, e.g.,* Recon. Memo at 2-4

(summarizing relevant portions of the corrected transcript of the first recorded

conversation) and 11-17 (describing the newly discovered non-privileged

evidence).[5]  Based on the contents of first recorded conversation between Chief

---

[5] *E.g.,* (1) Acting HPD Deputy Chief Axt's description of the January 11, 2017 meeting and his conversation with Deputy Corporation Counsel ██ in which ██ conceded that the proposal to pay Kealoha using HPD salary funds was illegal, *id.* at 11, *see also* Second Moriyama Decl. at ¶ 10; (2) Sword's letter to City Council Chair Ron Menor stating that the contemplated retirement agreement with Kealoha would not require City Council approval "because there is no employment claim that has been made by Chief Kealoha" and that any agreement would "not solely nor primarily concern the use of city funds;" *see* Ex. "G" (Doc. No. 7-9) (emphasis added); (3) the January 18, 2017 letter agreement between the Police Commission and Kealoha that had many characteristics of a settlement agreement, including a broad release provision and a lump-sum payment of $250,000 -- $190,000 of which was a severance payment and $60,000 of which was payment for "fees, costs and expenses;" *see* Recon. Memo at 13-14 and Ex.

Okimoto and Leong that outlined how Leong wanted to structure the Kealoha

payment in order to evade City Council approval, the government's proffer relating

to the conversation between Deputy Chief Axt and ▮DP▮ in which ▮DP▮ admitted

that the proposal to pay the Kealoha settlement with HPD funds was illegal --

along with the corroborating evidence described in the Recon. Memo, and note 7,

*supra* -- are sufficient to support a "good faith belief by a reasonable person" that

an *in camera* review of the three recorded conversations might reveal evidence to

establish the claim that the crime-fraud exception applies.  Accordingly, the

magistrate judge's failure to consider the contents of the three recorded

conversations in determining whether the crime-fraud exception applied was

clearly erroneous and contrary to law.[6]

---

"H" (Doc. No. 7-10); and (4) the evidence that BFS issued a single check, but
processed the $250,000 Kealoha payment as three separate transfers in the amounts
of $99,999.00, $99,999.00 and $50,002.00, even though all three transfers involved
the same "Pay Event Type" of SVN; the same "Event Date" of January 26, 2017;
the same "Document Code" of OTPAY; and the same "Document ID" of
17012600000000015471. *See* Third Moriyama Decl. (Doc. No. 8-1) at ¶ 4(a) - (d)
and Exs. "J"-"K" (Doc. Nos. 8-2 to 8-3).

[6] The magistrate judge also erred in disregarding the additional evidence submitted
by the Government on reconsideration because he found that "[m]ost of the
evidence ... preceded the Motion Hearing" and "[t]he 'new' facts which occurred
after January 19, 2017 are either public information or simply supplement or
support the information provided in the Motion or at the Motion Hearing."  Order
at 23.  In submitting the newly obtained or discovered evidence, the Government
represented that either it did not have access to the evidence at the time it filed the
Motion or the evidence arose out of events that occurred after the Motion was
denied." *See* Second Moriyama Decl. at ¶10.  The fact that some of the

14

C.  On Reconsideration, The Court Should Find That
The Crime-Fraud Exception Applies in this Case.

Due to the above-described erroneous rulings, the magistrate judge denied

the Recon. Motion without properly considering whether the evidence proffered by

the Government in support of the crime-fraud exception.  On reconsideration, this

Court should find that the Government satisfied the *prima facie* showing necessary

to invoke the crime-fraud exception in this case.

In order to invoke the crime-fraud exception to divest facially privileged

communications of the protection of the attorney-client privilege, the government

must make a *prima facie* showing of (1) the existence of a crime or fraud; and

(2) a relationship between the privileged communications and the illegality.

*United States v. Chen,* 99 F.3d 1495, 1503 (9th Cir. 1996) (*quoting In re Grand

Jury Proceedings (The Corporation)*, 87 F.3d 377, 380 (9th Cir. 1996)).  The

Government has presented sufficient evidence to satisfy both prongs of the test.

1.  The Proffered Evidence Was Sufficient to Establish a
*Prima Facie* Showing of a Violation of 18 U.S.C. § 666.

To make a *prima facie* showing of the existence of a crime, the United States

need only present evidence sufficient to establish reasonable cause to believe that a

---

information proffered by the Government has been publicly disclosed by the
targets or the media is irrelevant and does not diminish its probative value in
determining whether the crime-fraud exception applies.  *See Zolin*, 491 U.S. at 575
(threshold showing to obtain *in camera* review may be met by using "any relevant
evidence, lawfully obtained, that has not been adjudicated to be privileged.")

federal crime has occurred or is occurring.  Reasonable cause "is more than

suspicion but less than a preponderance of the evidence." *Chen*, 99 F.3d at 1503.

As noted in the Recon. Memo at 22, a violation of Section 666(a)(1)(A)

requires proof of the following elements:

(1)     That the defendants were agents[7] of a State or local government or
        agency;

(2)     That in a one-year period, the State or local government or agency
        received federal benefits in excess of $10,000; and

(3)     That the defendants intentionally misapplied property valued at
        $5,000 or more that is owned by, or is under the custody or control of,
        the State or local government or agency.

In proving a violation of Section 666 based on an intentional misapplication of

funds, the United States need not show that the defendants benefitted personally.

*See United States v. Urlacher*, 979 F.2d 935 (2nd Cir. 1992).  In *Urlacher*, the

court found that the first four prohibited acts listed in Section 666(a)(1)(A) -- *i.e.*,

embezzling, stealing, obtaining by fraud and the unauthorized conversion of

property to the use of a person other than the rightful owner -- related to the

unlawful taking of funds for personal gain.  In interpreting the fifth prohibited act

listed in Section 666(a)(1)(A) -- *i.e.*, the intentional misapplication of property –

---

[7]  The agent need not be someone in a position of trust, and a breach of trust is not
a requirement for violation of this statute. *See United States v. Brann*, 990 F.2d 98
(3d Cir. 1993); *United States v. Fernandez*, 2013 WL 3215461 (1st Cir. June 26,
2013) (state legislator).

the *Urlacher* court held: "Intentional misapplication, in order to avoid redundancy,

must mean intentional misapplication for otherwise legitimate purposes; if it were

for illegitimate purposes, it would be covered by the prohibitions against

embezzlement, stealing, obtaining by fraud, or conversion." 979 F.2d at 938

(upholding conviction of a police chief who used at least some of the funds he

embezzled for legitimate police purposes). Thus, Section 666 can be violated

based on an intentional misapplication even if the misapplied funds are used for an

otherwise legitimate government purpose. *See, e.g., United States v. Frazier*, 53

F.3d 1105 (10th Cir. 1995) (superseded on other grounds) (recipient of Department

of Labor funds misapplied those funds when he used money intended for training

to buy computers, even though computers benefited his organization); *United*

*States v. Shelton*, 816 F. Supp. 1132, 1137 (W.D. Tex. 1993) ("Subsection (c) of

Section 666 does not serve to absolve the Defendant of wrongdoing merely

because the funds were used to pay a "salary," especially where that "salary" is not

bona fide").

Here, the first two elements of Section 666(a)(1)(A) are easily satisfied.

Leong, Sword, Koyanagi and DP are City attorneys and/or the heads of City

executive branch agencies, and as such, all of them are agents of the City and

County of Honolulu. The United States proffers that both the City and HPD

17

receive substantially more than $10,000 in federal funds in any given one-year period.

The third element -- the intentional misapplication of HPD and/or City property valued at $5,000 or more -- is also satisfied. Here, the convoluted payment scheme designed by Leong, Sword, Koyanagi and ▮DP▮ to use HPD salary funds to pay the $250,000 Kealoha settlement, without first obtaining the required approval of the City Council, and then later, secretly replenishing HPD's operating budget with $250,000 in City funds from the BFS provisional account without Council approval, would constitute at least a conspiracy or an attempt to intentionally misapply more than $5,000 of HPD and/or City funds in violation of 18 U.S.C. § 666(a)(1)(A). The scheme implicates and seeks to avoid two sections of the Revised Ordinances of the City and County of Honolulu ("ROH") -- ROH §§ 2-3.4(a) and 2-17.2(c)(1) -- which require City Council approval for certain large payments and transfers of City funds.[8]

---

[8] ROH § 2-3.4(a) provides that, except as provided in § 2-3.1(d), "*no claim shall be adjusted, settled, or compromised without the prior approval of the council*" (emphasis added). ROH § 2-3.1(d)(1) gives the Corporation Counsel authority to settle claims involving $5,000 or less. The Hawaii Supreme Court has held that ROH § 2-3.4(a) vests exclusive authority in the City Council to settle or compromise a claim in exchange for consideration involving the commitment of City funds over $5,000. *See Harris v. DeSoto*, 80 Haw. 425 (1996).

ROH § 2-17.2(c)(1) requires City Council approval for all transfers of funds from one budget activity to another when the amount of the transfer is more than $100,000:

Here, the Agreement between the Police Commission and Kealoha should have been submitted to the City Council approval since it constitutes a settlement involving more than $5,000.  *See* ROH § 2-3.4(a).  The Agreement has all the attributes of a settlement agreement, including the following:  (1) the payment of $190,000 as a "severance payment" and $60,000 for "fees, costs and expenses;" (2) an extremely broad release of Kealoha's claims against the Police Commission and HPD, including all claims arising out of Kealoha's "employment with HPD[9] and/or [his] retirement from HPD;" and (3) the express language stating that the $250,000 payment constitutes consideration for Kealoha's waiver and release of claims set out in Paragraph 6 of the Agreement.  Because Sword and/or others wanted to avoid the "nine bananas up at the council,"[10] however, he, Leong, Koyanagi and/or

---

(1)  *No transfer of funds from an activity shall be executed without council approval by resolution when the cumulative amount of transfers from that activity shall total in excess of $100,000.00 or 10 percent of the amount appropriated for that activity in the executive operating budget ordinance . . . whichever is less.*

(Emphasis added).

[9]  The release language in Paragraph 6 of the Agreement stands in stark contrast with Sword's January 13, 2017 letter, in which he assured City Council Chair Menor that Council approval was not necessary because "there is no employment claim that has been made by Chief Kealoha" and "the primary purpose of the agreement is to effect his retirement in a way that is least disruptive to the HPD." *See* Ex. "G" at 2.

[10]  *See* Recon. Memo at 6; Ex. "B" (Doc. No. 7-4) at 6.

DP  designed and agreed to implement their convoluted payment scheme to create

the appearance that the Agreement, including the $250,000 lump sum payment,

was not a settlement that required City Council approval under ROH § 2-3.4(a).

The proposed scheme includes several steps and multiple transactions.  First,

the use of salary funds from HPD's operating budget to pay the $250,000 Kealoha

settlement is a potential misuse of those funds in light of HPD's insistence that it

did not have sufficient operating funds to pay for the settlement, and because it

furthers Leong, Sword, Koyanagi and/or DP 's improper intent to create the

appearance that the Agreement did not "solely or primarily concern the use city

funds" and was a matter "solely vested in the Commission," as stated by Sword in

his January 13, 2017 letter to City Council Chair Menor, *see* Ex. "G" (Doc. No. 7-

9) at 2, by purportedly paying Kealoha with HPD salary funds.  In the second

phase of the scheme -- which is yet to be implemented – the HPD salary funds will

be secretly replaced with City funds under false pretenses.  As described by Leong

and Koyanagi, $250,000 in City funds can be surreptitiously transferred to HPD's

budget under the guise that it is a routine transfer from a BFS provisional account

for vacant positions for the stated purpose of providing money to HPD to pay for

vacant positions that had been filled or were being filled.  This subsequent transfer

-- if falsely represented by HPD to be for the purpose of paying for vacant

positions that were filled, as suggested by Leong and Koyanagi -- would only

20

require notification to the City Council via a quarterly report submitted by BFS,

and would not constitute a "transfer of funds from an activity" requiring City

Council approval under ROH § 2-17.2. The transfer of $250,000 in City funds

from the provisional account to replace the $250,000 of HPD funds that were used

to pay Kealoha would, in fact, constitute a "transfer of funds from an activity" and

would trigger the need for City Council approval under ROH § 2-17.2. Thus, the

scheme proposed by Leong, Koyanagi, Sword and/or DP would require HPD

personnel to lie about the purpose for the subsequent transfer of funds to HPD,

which the senior staff of HPD refused to do. *See* Recon. Memo at 6-8; Ex. "C"

(Doc. No. 7-5) at 1-2. Taken as a whole, this convoluted payment scheme

involving the payment of the $250,000 Kealoha settlement with HPD funds, and

the subsequent repayment of the $250,000 to HPD using unapproved City funds

from the BFS provisional account, constitutes an attempt to intentionally misapply

HPD and City funds in order to conceal the fact that the $250,000 Kealoha

settlement is secretly being paid with City funds from the BSF provisional account

without the necessary approval by the City Council, and not with HPD salary funds

as publicly represented by Sword and others.

Based on the four recorded conversations and the newly discovered evidence

presented in support of the Recon. Motion, this Court should find that the United

States did present sufficient evidence to establish reasonable cause to believe that

21

Leong, Sword, Koyanagi and DP are involved in a violation of 18 U.S.C. § 666

and/or a conspiracy or attempt to violate 18 U.S.C. § 666, and that the first prong

of the *prima facie* showing necessary to apply the crime-fraud exception has been

satisfied.

        2.     The Subject Recorded Conversations Are Related to, and
                 in Furtherance of, the Alleged Violation of 18 U.S.C. § 666.

With regard to the second prong of the United States' *prima facie* showing –

*i.e.*, the relationship between the privileged communications and the alleged crime

-- the United States has amply satisfied that requirement. Here, the four recorded

conversations provide critical evidence of the potential crime, including Leong,

Sword, Koyanagi and DP 's agreement to engage in the alleged wrongdoing; a

description of their scheme to intentionally misapply $250,000 in HPD and City

funds in order to pay the Kealoha settlement without obtaining City Council

approval as required by ROH §§ 2-3.4(a) and/or 2-17.2(c); and their efforts to

conceal the misapplication from the City Council and the public. These

conversations -- in which Leong, Sword, Koyanagi and DP were attempting to

persuade or coerce Chief Okimoto and his senior staff to cooperate and go along

with the scheme -- were made in furtherance of the crime. As such, these recorded

conversations are central to the grand jury investigation of these government

officials. This Court should find that the United States has demonstrated that the

purported privileged communications are related to the alleged crime in satisfaction of the second prong of the crime-fraud determination.

III. CONCLUSION

As the magistrate judge's Order is contrary to law and clearly erroneous, the United States respectfully urges the District Court to issue an order granting this appeal, and finding that upon reconsideration of the evidence and arguments presented by the Government, the United States has established the *prima facie* showing necessary to apply the crime-fraud exception in this case to abrogate any privilege relating to the subject recorded conversations.

DATED:  March 7, 2017, at Honolulu, Hawaii.

FLORENCE T. NAKAKUNI
United States Attorney
District of Hawaii

By _____
RACHEL S. MORIYAMA
THOMAS MUEHLECK
Assistant U.S. Attorneys